**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MITCHELL MCPHERSON,<br><br>*Plaintiff*,<br><br>*v.*<br><br>McDONALD'S USA, LLC, a Delaware limited liability company, and McDONALD'S CORPORATION, a Delaware corporation<br><br>*Defendants*. | ) | Case No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES Plaintiff MITCHELL MCPHERSON, by his attorneys LOEVY & LOEVY, and complaining of Defendants MCDONALD'S CORPORATION and MCDONALD'S USA, LLC, state as follows:

## INTRODUCTION

1. This case arises from McDonald's racial discrimination against Mitchell McPherson.

2. Plaintiff Mitchell McPherson is a Black, former McDonald's franchisee who was forced out of the McDonald's system due to McDonald's systematic racial discrimination.

3. Plaintiff put his heart and soul into his dreams of owning and operating McDonald's stores and building generational wealth for his family.

4. As Plaintiff sought to grow his business from two successful suburban stores in New York, McDonald's directed that Plaintiff, solely because he was Black, could only franchise and operate stores that were in predominantly Black neighborhoods. These stores had lower sales

and profits than McDonald's stores in white neighborhoods. McDonald's refused to allow Plaintiff to become a franchisee in white neighborhoods.

5. McDonald's executives intentionally placed Plaintiff in these stores based on the racist belief that customer sales would increase—and that McDonald's bottom line would therefore improve—if stores were operated by individuals who had the same skin color as the rest of the community.

6. After McDonald's persistent urging, Plaintiff agreed to purchase a package of stores in Baltimore, Maryland, which he operated from 2001 to 2021.

7. Once Plaintiff took on the Baltimore stores, McDonald's continued to discriminate against him based on his race and breached its agreements with Plaintiff. McDonald's refused to offer Plaintiff the same support that McDonald's offered white franchisees, and McDonald's subjected Plaintiff to harassing treatment that it never directed at white franchisees.

8. Plaintiff was forced to pay significantly higher operating costs than his white counterparts due to security costs, higher insurance rates, and higher employee turnover. Yet, when confronted with the economic harms it had caused, McDonald's refused to provide Plaintiff with any of the needed financial assistance, including rent relief. Meanwhile, McDonald's routinely provided such assistance, including rent relief, to white owner/operators, who did not face nearly as serious operating challenges.

9. Moreover, when Plaintiff approached McDonald's about purchase opportunities in affluent white communities—stores that could have given him the financial cash flow to help pay costs at his lower-profit locations—McDonald's uniformly denied him those opportunities because he was Black.

10. McDonald's employed a well-honed practice when it identified a Black franchisee it wanted to force out of the system: ramping up unannounced inspections at all times of the day and night to find infractions McDonald's could use to justify a poor business review. In turn, McDonald's drew upon these poor business reviews to deem franchisees ineligible for expansion or deny renewal of their leases. In contrast, when McDonald's wanted to keep a white franchisee in the system, McDonald's provided extensive advanced notice of their planned inspections, and helped prepare white franchisees for a successful inspection.

11. Plaintiff was no exception to this practice, as McDonald's ramped up inspections to force Plaintiff out of the system.

12. McDonald's racially discriminatory business practices were compounded by additional overt displays of racism by McDonald's, up and down the chain of command. The routine racist indignities that Plaintiff suffered included several McDonald's managers verbally attacking and denigrating Plaintiff without consequence.

13. McDonald's intentional discrimination against Plaintiff based solely on the fact that he was Black directly caused him extreme harm. Among other things, McDonald's discriminatory and illegal actions devastated Plaintiff's livelihood, deprived him of valuable opportunities, and ruined his physical and emotional health. Without McDonald's intentional race discrimination against Plaintiff, he would never have suffered this harm.

14. Plaintiff now seeks to recover for the harm McDonald's caused and to redress the race discrimination and other tortious conduct he suffered at the hands of McDonald's.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, §1332, and § 1367.

16. This Court has personal jurisdiction over Defendants McDonald's USA, LLC and McDonald's Corporation because each of their principal places of business is in the State of Illinois and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

17. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim have occurred and are occurring in the Northern District of Illinois, and Defendants transacted affairs and conducted activity that gave rise to the claim of relief in this District. Further, both Defendants' principal place of business is in this District.

## PARTIES

18. Plaintiff Mitchell McPherson is a Maryland resident. He is Black.

19. Defendant McDonald's Corporation is incorporated in Delaware and maintains its principal place of business in Illinois. Defendant McDonald's USA, LLC, the franchisor for McDonald's in the United States, is a wholly owned subsidiary of McDonald's Corporation that is similarly incorporated in Delaware and operates its principal place of business in Illinois. For ease of reference, both defendants are referred to collectively as "McDonald's" throughout the complaint.

## FACTUAL ALLEGATIONS

### Franchise Structure

20. McDonald's business model depends on its franchisees. Out of McDonald's 38,000 locations around the globe, approximately 93% are operated by franchisees. McDonald's retains control of the remaining locations through its wholly owned subsidiary, McDonald's

Operations Co. ("McOpCo"). McDonald's earns roughly 69% of its $21-23 billion in annual revenue from the rents and fees it charges its franchisees.

21. As the franchisor, McDonald's develops and oversees McDonald's restaurants, including a specific menu of food items. McDonald's owns or leases the land on which the restaurants are located. Franchisees, also known as owner/operators, are granted the right to operate a specific McDonald's restaurant and sell McDonald's products in exchange for fees and an agreement to pay rent.

22. For a traditional restaurant, a franchisee will oversee a restaurant at a dedicated McDonald's location with a full menu. The typical franchise term for this type of restaurant is set at 20 years.

23. What McDonald's pitches as a tremendous growth opportunity to prospective franchisees is more akin to a sharecropper system, in which McDonald's provides the land and reaps the rewards of its franchisees' labor. This power imbalance is captured in McDonald's standard franchise agreement, which it executes with each of its franchisees.

24. The Agreement stipulates that franchisees must meet a stringent set of requirements and pay a variety of fees to McDonald's. Fees include rent based on a percentage of the location's gross sales, collective advertising costs, a monthly service fee subject to gross sales, and royalties.

25. Franchisees bear the costs of operations. These operational costs include insurance, maintenance, and equipment, like kitchen fixtures and lighting, all of which must satisfy standards that McDonald's sets. All franchisees must comply with all of McDonald's requirements for quality, service, and cleanliness, as well as any new or existing procedures

McDonald's imposes, which McDonald's enforces unevenly depending on the race of the franchisee.

26. Even though the Agreement is favorable to McDonald's, McDonald's retains obligations to its franchisees. Under the Agreement, McDonald's pledges to "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes *generally* available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added).

27. Additionally, McDonald's reserves the right to inspect a franchisee's restaurant but only at "*reasonable* times to ensure that [the] Franchisee's operation" complies with McDonald's standards and policies.

28. Given that the typical lease term is set at 20 years, McDonald's begins discussions about whether to renew a franchisee's lease at least three years prior to the lease's expiration.

29. If a franchisee wishes to extend his or her lease or expand to additional locations, the franchisee and McDonald's engage in discussions about potential extensions or expansions.

30. Expansion and ownership of multiple stores is key to a franchisee's success at McDonald's. Owning multiple stores gives a franchisee breathing room if one store dips in sales or requires a costly renovation.

31. In the past, McDonald's applied a 40-mile standard for expansion, meaning that operators were encouraged to not to expand beyond a 40-mile radius from their stores' location. More recently, McDonald's has relaxed that standard and allowed operators to purchase stores beyond the 40-mile radius, though it has done so only with white franchisees.

32. If a franchisee decides to sell a location, he or she must first receive McDonald's written consent. The franchisee must provide McDonald's at least 20 days' notice of their

intention to sell, along with the name and address of the prospective buyer, and the terms and conditions of the agreement. McDonald's reserves the right of first refusal, meaning that it has the first option to purchase the restaurant.

33. In evaluating whether to provide consent for a sale, McDonald's may consider the prospective purchaser's "work experience and aptitude; financial background; character; ability to personally devote time and best efforts to managing the Restaurant; residence in the locality of the Restaurant; equity interest in the Restaurant; conflicting interests; and such other criteria and conditions as McDonald's shall then apply." Franchise Agreement § 15(d). However, "[s]uch consent shall not be arbitrarily withheld." *Id*.

34. Significantly, McDonald's does not employ an "open market" system for selling its stores. To purchase a store, a franchisee must either receive an offer from McDonald's for a particular location or a franchisee must hear about the store being put up for sale from the seller or through the grapevine. As a result, Black franchisees, including Plaintiff, were limited to purchasing restaurants McDonald's offered them—low-volume stores in dangerous locations—or to purchasing from other Black operators, who helped them access opportunities that were not accessible.

35. McDonald's employs a hierarchical system to oversee its franchisees. During Plaintiff's tenure, the President of McDonald's USA managed overall operations for the corporation's 14,000 restaurants across the country. Below the President, the Presidents of the East and West Divisions oversaw all restaurants in the eastern and western areas of the country, respectively. Within each of those two divisions, the General Manager or Regional Manager supervised franchisees within a particular region, as well as managed real estate and development strategy. The "Vice President and Regional Manager," along with the Vice

President of Quality, Service, and Cleanliness ("QSCVP"), was responsible for all franchising decisions within a given region, including setting up the franchisee with a particular location and determining whether a franchisee was eligible for growth and rewrite. Field Service Managers or Representatives managed and developed strategy for a sub-set of franchisees and reported to the QSCVP. Finally, Business Consultants conducted graded visits and inspections, reporting back to the Field Service Manager, who in turn reported to the Director of Operations.

36. At each stage of the franchising process, from selecting a franchise location to setting rental prices to approving the sale of a store and more, McDonald's employees intentionally discriminated against Black franchisees, including Plaintiff.

**A History of Racial Discrimination Against Black Franchisees**

37. McDonald's has a long history of discriminating against Black franchisees.

38. Upon its founding in 1955, McDonald's installed its restaurants only in white neighborhoods and barred Black individuals from becoming franchisees.

39. However, following white flight from urban areas in the late 1960s and 1970s and Martin Luther King's assassination in 1968, McDonald's began recruiting Black owner/operators to take over stores in cities. McDonald's approved only "zebra" or "salt and pepper" partnerships, in which Black franchisees partnered with a white owner/operator to purchase a location.

40. In 1972, McDonald's first Black owner/operator, Herman Petty, helped found the National Black McDonald's Operators Association (NBMOA) to advocate for Black franchisees.

41. In 1982, McDonald's sued Charles Griffis, a Black owner/operator, for breach of contract after he bought two Popeyes franchise locations—a McDonald's competitor. Griffis countersued McDonald's for intentionally placing him in "ghetto" locations and restricting him from purchasing stores in suburban areas. McDonald's settled with Griffis for $4.7 million.

42. That same year, McDonald's began facing public allegations against McDonald's for its practice of "redlining" Black owner/operators by forcing them into agreements to operate older, lower-volume restaurants in need of costly renovations in Black neighborhoods.

43. Jesse Jackson's civil rights organization, PUSH, protested McDonald's practice of systematically placing Black franchisees in less desirable and higher-debt restaurants. The NAACP in Chicago and Los Angeles echoed those protests and organized boycotts of the restaurant chain.

44. In 1996, McDonald's Executive Vice President Tom Dentice conceded in a letter that "for business reasons we thought were valid at the time, the company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." McDonald's admitted that by discriminating against Black franchisees based on their race, it thought it would make more money. McDonald's placed franchisees in Black communities that reflected their race because McDonald's thought Black owners should be limited to Black communities because of the color of their skin. In addition, McDonald's thought that it would benefit McDonald's bottom line to put Black franchisees in Black communities. As a result, Black franchisees were placed in Black neighborhoods and could not purchase stores in suburban, white neighborhoods.

45. Conversely, white franchisees were rarely, if ever, placed in stores that served Black consumers. Once placed in less profitable and more costly franchise locations, Black franchisees faced a series of security and operational issue. As a result, McDonald's forced Black franchisees to spend much more money than white counterparts on security and maintenance measures, including security guards.

46. "Security costs" also applies to the myriad other costs and profit losses that came with McDonald's redlining a franchisee into low-income neighborhoods. The location McDonald's placed a franchisee dictated the store's profit margins. Owner/operators in low-income neighborhoods were forced to decrease standard prices of food and drink items to sell them, and the customer base in low-income neighborhoods was more likely to buy lower-price items, like a double cheeseburger, as opposed to prices with a higher mark-up, like a drink or fries.

47. Even though white and Black owner/operators had the same products, branding, and experience, white operators were able to charge higher prices and sell far more profitable items, whereas Black owner/operators, including Plaintiff, had to sell less profitable products for lower prices, solely because of their race. To analogize, McDonald's allowed white owner/operators to sell their items at Saks Fifth-Avenue prices and forced Black owner/operators to sell the same items at Walmart prices because of the company's racial discrimination.

48. Again, McDonald's discriminated against Black franchisees by deciding to never subsidize these costs for Black franchisees. McDonald's could have offset the additional costs that Black owner/operators, including Plaintiff, faced by granting rent relief, meaning that it would have charged a lower percentage for rent, but McDonald's did not offer this relief to Black franchisees. At the same time, this practice was commonplace for white operators, as McDonald's often granted them rent relief when they suffered a dip in sales. But McDonald's refused to grant rent relief to Plaintiff, especially as compared to his white counterparts, because of his race.

49. McDonald's continued its intentional race discrimination against Black franchisees by routinely blocking Black owner/operators, including Plaintiff, from purchasing white franchisees' locations.

50. As a result, McDonald's stuck Black owner/operators, including Plaintiff, in a cycle they could not escape from—placing them in low-income, high-crime areas, forcing them to pay unforeseen security and operational costs, and prohibiting them from purchasing stores in affluent areas that could have helped alleviate the financial burden.

51. McDonald's also relied on a well-honed practice of forcing Black owner/operators out of the system, which it applied only to Black owner/operators, including Plaintiff: ramping up unannounced inspections on their stores at all times of the day or night at far greater frequency and with much greater inconvenience than inspections of white franchisees' stores. By increasing inspections, McDonald's had a better chance of finding faults at a Black franchisee's store that they could use to justify deeming them ineligible for expansion or refusing to renew their lease.

52. Even when Black franchisees attempted to sell their stores, McDonald's continued to discriminate against them. Rather than allowing Black franchisees to sell to the highest bidder of their choice, as McDonald's did for white franchisees, McDonald's controlled the sales by forcing Black franchisees of profitable stores (after the franchisees had worked tirelessly to improve operations) to sell to McDonald's-selected white buyers.

53. This is not the only evidence that McDonald's knew that it was discriminating against Black franchisees on the basis of their race for McDonald's own financial benefit. In 1996, McDonald's CEO Ed Rensi agreed to implement a program that McDonald's said was intended to establish equity between Black and white franchisees. As part of the program,

McDonald's pledged to sell more profitable restaurants to Black franchisees and to offer them temporary rent relief. But McDonald's never followed through on these pledges to rectify the discrimination it knew it was perpetuating. Instead, McDonald's leadership disbanded the program in 2001, unbeknownst to Plaintiff.

54. If McDonald's had made any progress to establish equity, it was wiped out when Steve Easterbrook and Chris Kempczinski took the reins as CEO and President of McDonald's USA, respectively, in 2015. Upon assuming the role of CEO, Easterbrook said that the number of Black owner/operators at McDonald's did not matter. This set the stage for the company to eliminate its nascent equity initiatives.

**McDonald's Continuing Practice of Discrimination against Black Franchisees**

55. Beginning in 2017, Easterbrook and Kempczinski unveiled the "Bigger Bolder Vision 2020" program with the goal of modernizing 80% of current McDonald's restaurants. The Program would require costly renovations for older restaurants, estimated at as much as $750,000 per store.

56. McDonald's knew that the program would eliminate Black owner/operators from the McDonald's system. That impact was revealed by an impact study conducted by the Boston Consulting Group prior to the program's implementation. Easterbrook and Kempczinski were aware of the results of the impact study and the disproportionate effect Bigger Bolder Vision 2020 would have on Black owner/operators, but they relentlessly pushed it anyway because they wanted to force Black owner/operators to exit the McDonald's system.

57. Under Easterbrook's and Kempczinski's racially discriminatory tenure as CEO and USA President of McDonald's, respectively, approximately a third of Black owner/operators were forced out of the McDonald's system—a much higher percentage than non-Black operators who left during this time. This exodus of Black franchisees coincided with Easterbrook's

decisions to deprioritize Black employees and consumers, including Easterbrook's purge of Black McDonald's employees from positions in senior leadership, an intentional decision to direct advertising budgets away from Black consumers, and the resulting decrease in sales to Black consumers.

58. In July 2018, McDonald's USA demoted Senior Executives Vicki Guster-Hines and Domineca Neal, both Black women. Both had relayed or spoken out about Black franchisees being subjected to discriminatory practices, like unfair grading visits. Their demotions were part of McDonald's purge of 43 Black senior executives during Easterbrook's tenure, composing 85% of McDonald's Black employees who were at Executive Director level and above. Guster-Hines and Neal sued McDonald's for discrimination in January 2020.

59. The Guster-Hines and Neal complaint revealed inside corporate information to Plaintiff for the first time, including evidence that McDonald's had been systematically and intentionally discriminating against Plaintiff on the basis of his race. Prior to these revelations, McDonald's had caused Black franchisees, including Plaintiff, to believe that McDonald's was treating Black owners/operators the same as white owners/operators.

60. Compounding the problem, given McDonald's control of information as the franchisor, and given its supposed public commitment to racial equality, Plaintiff was unaware, and could not know or have learned through due diligence, that McDonald's was depriving him of franchise opportunities offered to white franchisees and was otherwise discriminating against him on the basis of his race.

61. In reality, by 2019, the annual cashflow gap between Black and non-Black franchisees increased to $75,380, up more than $45,000 from 2010.

62. Owner/operator Larry Tripplett filed a letter on behalf of the NBMOA to McDonald's East and West Zone Division Presidents, stating that "the trajectory of the treatment of Black Owners is moving backwards. Through no fault of our own we lag behind the general market in all measures." He noted that "[t]he current state of affairs for Black Owners can only be described as hostile" and identified permanent rent reduction as one necessary step, among others.

63. By 2020, roughly half of Black franchisees had been forced out of the McDonald's system, as compared to only 10% of white owner/operators in the same timeframe. Despite Easterbrook's firing in 2020, Black franchisees' circumstances have not improved under now-CEO Chris Kempczinski.

64. McDonald's intentional discrimination is evident in the number of Black franchisees in its system as well. From 1998 to 2020, the number of Black franchisees fell from 377 to 186. Meanwhile, the number of total McDonald's stores doubled from 15,086 to 38,999. Stores owned by Black franchisees only earn about two-thirds of the average McDonald's store.

65. Plaintiff's individual experience that follows amplifies that McDonald's purposely treated him worse because he was Black and that McDonald's intentional discrimination caused him massive harm.

**Mitchell McPherson**

66. Plaintiff Mitchell McPherson owned and operated nine stores during his 35-year tenure at McDonald's. He is Black.

67. Plaintiff entered McDonald's registered applicant training program in 1988.

68. McDonald's offered Plaintiff his first store in 1990, located in LaGrange, New York.

69. The location was in a suburban, upper middle-class area.

70. During his time at the LaGrange, NY location, then-McDonald's Chief Financial Officer Gerry Newman recognized Plaintiff's success, informing him via letter that his store was the most profitable store at its sales level in the country.

71. In 1995, Plaintiff purchased his second store in the neighboring town of Pleasant Valley, New York.

72. In February 2001, McDonald's Field Consultant Ken Green, a white man, visited the store. Plaintiff had faced difficulties staffing the store because of the frequent snowstorms, and the purpose of Green's visit was to provide guidance.

73. After finding a few refrigerated products in the store that were outdated, Green began verbally attacking and swearing at Plaintiff.

74. Plaintiff told a friend about the incident, who in turn reported it to McDonald's Regional Office. Plaintiff had never heard of Green swearing at a white franchisee in this manner. But for his race, Green would not have sworn and verbally attacked Plaintiff over such a minor issue.

75. Two weeks later, a McDonald's representative visited Plaintiff's store and apologized for what had happened.

76. To Plaintiff's knowledge, Green did not receive any consequences for his inappropriate behavior. Yet, following the incident, McDonald's assigned a new consultant to inspect Plaintiff's stores—an African American man.

77. Shortly after the incident with Green, in 2001, McDonald's began offering Plaintiff opportunities to expand and purchase more stores, in exchange for selling his two New York stores.

78. Plaintiff agreed and worked to arrange a deal for another owner/operator, Carlos Wong, to purchase his store. Wong happened to be the only other owner/operator of color in Plaintiff's area.

79. Consistent with McDonald's practice of reserving lucrative stores in predominantly white areas for white franchisees, McDonald's refused to allow Plaintiff's deal to go through with Wong, and instead provided Plaintiff a list of white owner/operators to whom he could sell his stores. Plaintiff was allowed to sell to any white operator in the area, as well as some white operators outside the area.

80. Plaintiff sold his two New York stores in 2001 to a white franchisee whom McDonald's had pre-approved.

81. In keeping with McDonald's discriminatory practice of intentionally placing Black franchisees into substandard stores in Black neighborhoods, McDonald's proposed a series of such stores to Plaintiff across the country. McDonald's denied him the opportunity to purchase a store in an affluent white neighborhood solely because of his race.

82. The first set of stores McDonald's offered Plaintiff were in a low-income, urban part of Rochester. Plaintiff visited the stores and found them to be in poor condition, in a dangerous neighborhood. Accordingly, he turned them down.

83. McDonald's then offered Plaintiff a package of five stores in Fort Pierce, Florida, all of which required extensive renovations. McDonald's typical practice was to bring stores up to standard before selling them to a new owner/operator.

84. McDonald's refused to abide by its standard practice and renovate the stores but continued to push Plaintiff to buy them. Given their condition and McDonald's unwillingness to renovate, Plaintiff refused.

85. McDonald's next offered Plaintiff a group of stores in Camden, New Jersey and Philadelphia, Pennsylvania, all of which were in dangerous, low-income areas and in poor condition. Plaintiff refused the offer. The owner/operator who accepted the stores, an African American man, was ultimately shot and killed in one of them.

86. In 2001, McDonald's Ombudsman Ron Hawkins offered Plaintiff a six-restaurant package in Baltimore. Three of the restaurants were located in particularly high-crime areas. Moreover, two of those three were in poor condition, and were not operating up to standards.

87. Plaintiff tried to exclude the two worst stores from the deal, but Hawkins refused, insisting that they must be purchased as a package or not at all. As a result, Plaintiff agreed to purchase the six stores.

88. Six months after Plaintiff's purchase, McDonald's informed him that they were relocating one of the stores (the "Golden Ring 3512" location) across the street. McDonald's had this information at the time of Plaintiff's purchase but did not disclose it to him.

89. The new location was considerably worse—there was restricted access to the restaurant, no signage, and rent would increase from 8.25% to 14%.

90. Plaintiff contacted Ron Hawkins and his NBMOA area representative, protesting the store's construction. However, McDonald's went forward with the construction of the new store and Plaintiff was forced to take it on.

91. Additionally, McDonald's decided to install a new location next to a Walmart, located 150 yards from the Golden Ring location.

92. Plaintiff pitched himself to purchase the store, knowing that it would eat into his Golden Ring location's sales. McDonald's denied him the opportunity and decided to run it as a

company-owned store before selling it to a white owner/operator. But for Plaintiff's race, McDonald's would have allowed him to purchase it.

93. In approximately 2002 or 2003, Plaintiff reached an agreement with Jim Schaeffer, a white employee, to become his Director of Operations.

94. However, McDonald's Vice President Jim Norberg declined to approve the employment contract. Not long after, McDonald's approved Jim Schaffer to work for a white operator, Michael Meoli. But for Plaintiff's race, McDonald's would have allowed Schaffer to work for him.

95. Over the next four years, Plaintiff substantially improved the volume of the Baltimore stores. Before his purchase, they were averaging sales below $1.6 million. By 2005, Plaintiff had increased the average to $2.3 million per year.

96. In 2010, Plaintiff negotiated a deal to acquire three more restaurants in Baltimore from another owner/operator for $5.3 million. The restaurants were near his current restaurants and were highly profitable. Additionally, Plaintiff was eligible for growth at the time and secured financing from Bank of America.

97. McDonald's, specifically QSCVP Wendell Sconiers and Regional Manager Albert Seecharan, refused to approve the purchase, without providing a reason. Plaintiff wrote letters to both individuals, inquiring why they had rejected the purchase but never received a response.

98. Ultimately, McDonald's approved the sale of those three stores to a white operator named Scott Radin.

99. But for Plaintiff's race, McDonald's would have approved the sales of these stores and allowed Plaintiff the opportunity to acquire profitable locations.

100. Near the end of 2012 or the beginning of 2013, Plaintiff purchased his seventh store in Baltimore (National Store 2606 or "Howard Street"). At that point, Plaintiff was desperate for growth opportunity and settled for a low-volume store.

101. This store was in a worse location, in poorer condition, and in a higher-crime area than his other Baltimore stores.

102. In 2013, Plaintiff was assigned a new Field Consultant, Jawad Huleis.

103. A fellow owner/operator warned Plaintiff that when McDonald's assigned Huleis as an operator's Field Consultant, it means they want to force the operator out of the system.

104. Plaintiff was plagued with security issues at his stores in Baltimore. In 2013, one of his employees was shot in the head outside the Hartford Road location after ending his shift at midnight.

105. In February 2013, the day of the Ravens' Super Bowl parade, a man was stabbed in front of Plaintiff's Howard Street store. He then ran into the store, collapsed, and died.

106. In one incident, an employee was attacked and seriously injured in the store's lobby. At another point, a customer entered the store and threatened an employee at gunpoint for not putting enough caramel sauce on his sundae.

107. In February 2016, Plaintiff informed Huleis that the police had asked him to close his Theatre District location due to a stabbing across the street.

108. During Plaintiff's tenure at the Northwood Plaza National location, two murders took place at the plaza, including one in which City Councilman Ken Harris was killed.

109. At Plaintiff's Howard Street location, an employee was almost stabbed a few days after she refused to give free food to a person demanding it and another employee was brutally attacked.

110. Plaintiff himself faced threats on his own life and those of his family members on at least three occasions between 2019 and 2021.

111. Plaintiff is not aware of any white operator who experienced threats to their lives or their family's lives.

112. Plaintiff reported every safety and security incident to McDonald's Corporation.

113. He begged McDonald's, via Regional Manager Harry Thomas, to take the Howard Street store back, telling them that he had never imagined that selling hamburgers would cost people their lives.

114. McDonald's refused to take the store back and told Plaintiff simply that these security issues were the normal course of doing business.

115. Plaintiff was consistently questioned and ignored by McDonald's when he reported his safety and security concerns.

116. In 2015, Vice President of Development and Construction David Nyst visited Plaintiff's North Ave. store after Plaintiff had reported severe construction defects at the location. McDonald's had shown no interest in fixing the store's construction issues since the rebuild in 2008. By 2015, the issues had become so severe that ceramic tiles were falling off the walls and one of the store's employees narrowly avoided a serious injury.

117. Upon arriving at the store, rather than responding to the construction issues, Nyst began verbally attacking Plaintiff and sticking his finger in Plaintiff's face.

118. Rattled by Nyst's behavior, Plaintiff called Field Service Manager Karen Paine to report what had happened with Nyst. Plaintiff never received an apology from Nyst or on his behalf, and Nyst never faced consequences for his verbal abuse. Plaintiff never heard of Nyst

similarly yelling at any white franchisees. But for his race, Nyst would not have yelled at Plaintiff in this manner.

119. Throughout his tenure, Plaintiff requested rent relief on his Baltimore stores, given that they were low volume and making much less money than white owner/operators' stores in the area.

120. McDonald's denied Plaintiff's requests for rent relief, stating simply that his stores were making enough money. However, the company granted such relief to white owner/operators.

121. When Bigger Bolder Vision was launched in 2020, the guidelines for passing company graded visits became more stringent. But after the outbreak of the COVID-19 pandemic in March 2020, McDonald's announced that it was pausing inspections at restaurants across the country.

122. Still, McDonald's Field Consultant Jawad Huleis continued to inspect Plaintiff's restaurants.

123. Plaintiff told the NBMOA that inspections were continuing at his restaurants and they relayed this concern to McDonald's on Plaintiff's behalf.

124. Additionally, Plaintiff discussed the continuing inspections with Regional Manager Harry Thomas who explained that the inspections were continuing because Plaintiff's restaurants had health department issues and had been closed by the health department.

125. None of this was true.

126. After speaking with Thomas, Plaintiff checked the health department website for closures in Baltimore, which provides a 5-year record of restaurant closures in the city. None of his restaurants were listed.

127. Plaintiff did not know of any white owner/operators who continued to have inspections at the time.

128. Indeed, a white owner/operator in the neighborhood, Scott Radin, who also had Huleis as his consultant had 5 or 6 health department closures at his stores in the past. Huleis did not conduct inspections of Radin's restaurants during the pandemic. During this time, Radin added between 8 to 13 stores to his portfolio.

129. This divergence demonstrates that McDonald's employed a different standard for Plaintiff, a Black franchisee, and Radin, a white franchisee. But for Plaintiff's race, Huleis would not have continued to inspect his restaurants during a time when inspections were paused across the country.

130. On one occasion when Huleis could not conduct the inspection because he was on vacation, McDonald's sent another consultant to inspect Plaintiff's stores. Under the new consultant, Plaintiff's stores passed with flying colors—they were graded at 90%+.

131. It became clear that Huleis was targeting Plaintiff's store because McDonald's wanted to force him out of the system.

132. In February 2021, Plaintiff participated in a video broadcast about reconstructing one of his restaurants, #12239, with McDonald's corporate employee Matt Cullen, Director of Development Brian Tabb, Regional Manager Harry Thomas, East Division President Mario Barbosa, and Director of Finance Matt Knadler.

133. During the video broadcast, Cullen mocked Plaintiff's speech impediment and mimicked his stutter.

134. Plaintiff felt deeply humiliated and embarrassed during and after the meeting.

135. After consulting with a fellow owner/operator, Plaintiff called the regional Vice President of Operations Lynn Rudy to express how hurt he was by Cullen's conduct.

136. Rudy, who had attended the video broadcast, provided no response, nor did Thomas or Barbosa.

137. Plaintiff followed up by sending a letter to Rudy complaining about the incident, as well as sending a letter to Regional Manager Bill Garrett.

138. Plaintiff never heard back from Rudy or Garrett and never received an apology. As far as he is aware, Cullen never faced any consequences for publicly humiliating Plaintiff. Were it not for Plaintiff's race, Cullen would not have mocked or disrespected him in such a manner.

139. Plaintiff had to receive both mental and medical treatment as a result of this incident.

140. By 2021, the discriminatory and unwarranted inspections of Plaintiff's stores had become too onerous for Plaintiff to continue operations.

141. Plaintiff had informed members of McDonald's executive-level management that he was being treated unfairly, including Senior Vice President of Operations Bill Garrett, President of McDonald's East Division Mario Barbosa, USA Senior Vice President of Human Resources Candace Jean-Louis, Vice President of Diversity and Ombudsman Bill Lowery, Vice President and General Manager Harry Thomas, and Vice President of Global Diversity and Inclusion Reggie Miller.

142. No one ever responded to his concerns.

143. Plaintiff's three remaining stores were all in low-income, high-crime areas. When Plaintiff approached McDonald's about selling his remaining stores, they directed him to buyers who were all Black or people of color.

144. As a result of the discrimination he endured at McDonald's, Plaintiff suffered and continues to suffer from chronic headaches, anxiety, and weight gain.

145. But for his race, McDonald's would not have subjected Plaintiff to increased inspections and failed him on every inspection.

146. But for his race, Plaintiff would have remained in the McDonald's system, to which he had dedicated 35 years of his life.

## CAUSES OF ACTION

## COUNT I

### 42 U.S.C. § 1981—Race Discrimination in Contracting

147. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

149. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race in their making, performance, modification and/or termination of their franchisor/franchisee contractual relationship with Plaintiff. In doing so, Defendants denied Plaintiff the enjoyment of the benefits, privileges, terms, and conditions of this contractual relationship.

150. If it were not for Defendants' intentional race discrimination, Plaintiff would not have suffered the harms discussed in this Complaint.

151. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race by engaging in misconduct such as:

a. forcing Plaintiff to franchise locations that were less profitable, located in lower-income or higher-crime neighborhoods, and in poorer physical condition than the franchise locations made available to white franchisees;

b. denying Plaintiff access to profitable franchise locations that were made available to white franchisees;

c. targeting Plaintiff for unfair and unreasonable inspections, in a manner that was not reflected in Defendants' franchisor/franchisee relationship with white franchisees;

d. denying Plaintiff the benefit of programs and opportunities that were offered to white franchisees; and

e. denying Plaintiff's requests to sell their franchises to the buyer of their choosing at a favorable negotiated price, in a manner that was not reflected in Defendants' approval decisions with respect to the sale of white-owned franchises.

152. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continue to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT II

**42 U.S.C. § 1981—Race Discrimination in Contracting (Pattern or Practice)**

153. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

154. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

155. Defendants' misconduct alleged in Count I, and as described in greater detail above, was part of a pattern or practice of discriminatory decision-making, pursuant to which Defendants regularly and purposefully discriminated against Black franchisees.

156. This discriminatory pattern or practice was so pervasive that it amounted to the Defendants' standard operating procedure with regard to their treatment of Black franchisees. Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; unfairly applying standards to Black franchisees that Defendants did not apply to white franchisees; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

157. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. § 1982—Discrimination in the Leasing of Real Property

158. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

159. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

160. As described in greater detail above, Defendants intentionally discriminated against Plaintiff on the basis of his race in the leasing of real property, including but not limited to: Defendants refused to lease favorable, more profitable restaurant locations to Plaintiff which

Defendants made available to white franchisees; Defendants forced Plaintiff to less profitable, lower quality restaurant locations; and Defendants unfairly and unreasonably denied Plaintiff's requests to sell his franchises and transfer his interest in real property to the buyers of his choosing at a favorable negotiated price.

161. If it were not for Defendants' intentional race discrimination, Plaintiff would not have suffered the harms discussed in this Complaint.

162. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV

**42 U.S.C. § 1982—Discrimination in the Leasing of Real Property (Pattern or Practice)**

163. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164. Plaintiff is a member of the class protected by this statute, in that Plaintiff is Black.

165. Defendants' misconduct alleged in Count III, and as described in greater detail above, was part of a pattern or practice of discriminatory decision-making, pursuant to which Defendants regularly and purposefully discriminated against Black franchisees.

166. This discriminatory pattern or practice was so pervasive that it amounted to the Defendants' standard operating procedure with regard to their treatment of Black franchisees. Defendants' discriminatory pattern and practice includes, as alleged above: forcing Black franchisees to locations that were less profitable than locations offered to white franchisees; refusing to allow Black franchisees to lease locations that were more profitable and only

providing white franchisees the opportunity to lease such locations; and refusing to agree Black franchisees' proposed sales of their stores and instead forcing Black franchisees to sell to Defendants' preferred purchasers when Defendants did not impose such conditions on white franchisees.

167. As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

### Illinois State Law—Breach of Contract

168. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

169. Plaintiff had a valid and enforceable written contract with Defendants.

170. Plaintiff performed his obligations under the contract.

171. As described in greater detail above, Defendants breached the contract by failing to perform their obligations under the contract.

172. As described in greater detail above, among the contractual obligations that Defendants breached was their obligation to make available to Plaintiff the same services, facilities, rights, and privileges with respect to their operation of McDonald's franchises as Defendants made generally available to other franchisees, specifically white franchisees. Section 3 of the Franchise Agreement provides that McDonald's must "make available to Franchisee all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes *generally* available, from time to time, to all its franchisees operating McDonald's restaurants." (Franchise Agreement ¶ 3) (emphasis added). McDonald's breached

this obligation by, among other things: not providing Plaintiff the rent relief and other financial assistance Defendants provided to white franchisees and conducting reviews of Plaintiff's restaurants at unreasonable times and under unreasonable circumstances that Defendants did not impose on white franchisees.

173. In addition, Defendants agreed to conduct reviews of Plaintiff's restaurants only at "*reasonable* times to ensure that [the] Franchisee's operation" complied with McDonald's standards and policies. (Franchise Agreement ¶ 12) (emphasis added). Defendants breached this obligation by conducting reviews of Plaintiff's restaurants at unreasonable times and under unreasonable circumstances, including during the outbreak of the COVID-19 pandemic, when it had paused inspections nationwide.

174. Further, Defendants agreed that "consent shall not be arbitrarily withheld" when Plaintiff attempted to sell his stores. Franchise Agreement § 15(d). Defendants breached this obligation when they arbitrarily refused to accept the terms of sale proposed by Plaintiff when he attempted to sell his New York stores to a fellow owner/operator, and when Defendants insisted that Plaintiff sell his stores to buyers hand-picked by Defendants.

175. As a result of Defendants' breach of contract described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### Illinois State Law—Tortious Interference with Business Relationships

176. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177. As described in greater detail above, as a result of his status as a McDonald's

franchisee, Plaintiff had valid business relationships with one or more individuals or entities, including but not limited to fellow franchisees with stores for sale.

178. Defendants had knowledge of these business relationships.

179. As described in greater detail above, Defendants, without any justification, intentionally interfered with these business relationships, including but not limited to their racially discriminatory conduct and breach of contract alleged in the Counts above.

180. As a result of Defendants' interference with business relationships described in this Count, Plaintiff suffered and continues to suffer damages, including but not limited to lost profits, lost business opportunities, direct and indirect financial loss and harm, damage to professional reputation, emotional injuries resulting from Defendants' intentional racial discrimination, and other grievous and continuing injuries and damages as set forth above.

* * *

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, awarding compensatory damages, punitive damages, attorney's fees, and any other relief this Court deems just and appropriate.

**Jury Demand**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:
MITCHELL MCPHERSON.

By: /s/ Annie Prossnitz

Jon Loevy

Daniel M. Twetten
Steve Art
Quinn K. Rallins
Annie Prossnitz
Loevy & Loevy
311 N. Aberdeen St.
Chicago, IL 60607
jon@loevy.com